Drs**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

CORRINE CRISTOFARO,

                              Plaintiff,

         v.                                                    **DECISION AND ORDER**
                                                               06-CV-0487S

LAKE SHORE CENTRAL SCHOOL DISTRICT
   with
TERRANCE REDMAN
   as Aider and Abettor,

                              Defendants.

## I.  INTRODUCTION

Plaintiff Corrine Cristofaro commenced this employment discrimination action by

filing a Complaint in the United States District Court for the Western District of New York.

(Docket No. 1.)  Therein, she alleges that Defendants Lake Shore Central School District

and Terrance Redman subjected her to a hostile work environment, discriminated against

her based on her gender (female), and retaliated against her for filing a complaint with the

New York State Division of Human Rights.  Plaintiff brings this action pursuant to Title VII

of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. (hereinafter, "Title VII") and the

New York State Human Rights Law, N.Y. Exec. L. §§ 296 et seq. (hereinafter, "NYHRL").

Presently before this Court is Defendants' Motion for Summary Judgment seeking

dismissal of the Complaint in its entirety.[1]  (Docket No. 24.)  Plaintiff opposes the motion.[2]

---

[1]In support of their Motion for Summary Judgment, Defendants filed a Memorandum of Law; Rule
56 Statement of Undisputed Facts; Attorney Declaration, with exhibits; Declaration of Jeffrey Rabey; and
Reply Memorandum of Law.

[2]In response , Plaintiff moved for an order denying Defendants' motion based on her opposing
Memorandum of Law; Rule 56 Statement of Facts in Dispute; Attorney Declaration, with Exhibits; and
Declaration of Corrine Cristofaro. Plaintiff's "motion" does not seek relief beyond what is available through
the simple filing of a response and thus her papers are construed as a response rather than a cross-

For the reasons stated below, Defendants' motion is granted.

## II.  BACKGROUND

A.    **Facts**

Lake Shore Central School District (hereinafter, the "District")  is made up of seven public schools.  (Def.'s Ex. 4.).  Plaintiff was hired by the District in 1993 as a business teacher at Lake Shore High School.   (Pl. Dep. 22:1; Defs.' Stmt. ¶ 1.[3])  She was granted tenure in November 1996.  ( Defs.' Stmt. ¶ 31.)  Plaintiff remained in her position until resigning in 2006.  (Id. ¶ 30.)  Plaintiff was a member of the teacher's Union throughout her employment. (Id. ¶ 32.)

Defendant Terrance Redman (hereinafter, "Redman") became the principal of Lake Shore High School in 1999 and remained in that position throughout the relative time period.  (Id. ¶ 9.)  As principal, Redman was Plaintiff's supervisor.  (Id. ¶ 10.)

1.    **Hostile Work Environment**

Plaintiff avers she was sexually harassed by Redman over a period of seven years. The incidents she alleges as the basis of her hostile work environment claim include:

> (1) On two occasions, in September 1999 and June 2000, Redman made remarks to the effect that she was looking good and looking fit.  (Pl. Dep. 28, 30.)  On one of those occasions he crooked his finger to call Plaintiff over to talk to him.  (Id. 30:3-4.)  Plaintiff did not make a complaint or grievance on either occasion.  (Id. 34:11-22.)

_____

motion.

[3]Referring to Defendants' Rule 56 Statement of Undisputed Facts, which contains citations to the record evidence in this case.  This Court has confirmed and is satisfied that the evidence cited supports the assertions therein.  Cf. Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 74 (2d Cir., 2001) (holding that factual allegations contained in a Rule 56.1 Statement that find no support in the record evidence must be disregarded and the record reviewed independently).

(2) In September 1999, Vice Principal Kevin Eberle told Plaintiff that co-workers in the men's lunchroom took bets on "places and times [she] or Mr. Redman will have a conversation involving sexual references." (Id. 39.) He stated Redman was present at the time of the conversation. (Id.)

(3) In spring 2004, when Plaintiff arrived late to a faculty meeting, Redman folded up the meeting agenda and threw it at her. (Id. 66, 127-28.)

(4) Redman falsely told an Assistant Principal that Plaintiff used the weight room when she had not. (Id. 109:12-16, 118:5-11.)

(5) In November 2004, Redman approached Plaintiff in the school library, asked her where in the building she was supposed to be, and touched the side of her body with his. (Id. 160-61.)

(6) In spring 2005, Plaintiff was running with a female co-worker and Redman yelled to them to "keep up the good work girls." (Id. 123.)

(7) In September 2005, Redman commented that Plaintiff gained weight over summer vacation. (Id. 64.) Plaintiff told him his comment was embarrassing and hurt her feelings. (Id. 69.)

(8) In April 2006, Redman came into Plaintiff's classroom and said something "derogatory." (Id. 168.)

Plaintiff believes Redman engaged in this conduct because she refused to participate in the "bet" and because he was attracted to her. (Id. 81.) Plaintiff admits she did not make a formal grievance or complaint about the bet, stating that she did not know how to go about doing so. (Id. 48:8.) At that time, Plaintiff was grievance chairperson for her Union.[4] (Id. 47-51.)

---

[4]Plaintiff sat as Grievance Chairperson for the Union from 1997-2001. (Defs.' Stmt. ¶ 32.) As Grievance Chairperson, Plaintiff was responsible for handling faculty complaints. (Id.) Her role was to file paperwork and discuss teacher's grievances, of a contractual nature, with the building principal. (Pl. Dep. 47-50.)

### 2.     Discrimination

Plaintiff also asserts that she was subjected to discriminatory treatment throughout her employment at Lake Shore High School.

#### a.     February 2000 and April 2002 Evaluations

For instance, Redman prepared Plaintiff's professional evaluations in February 2000 and April 2002.  (Defs.' Ex. 16, 17.)  Plaintiff believes he purposefully underrated her because she did not respond to his comments.  (Pl. Dep. 59-60, 101-102, 136-37.)

#### b.     Failure to Promote Plaintiff to Chair of the Business Department

In June 2000, Plaintiff applied for the position of Chairman of the Business Department.  (Pl.'s Stmt. ¶ 36.)  To become Chair, a candidate must first win a vote among the department faculty, then be approved by the building Principal and Superintendent.  (Redman Dep. 60:8-12, 17-19.)  The Superintendent then notifies the Board of Education, which must approve the recommendation.  (Murphy Dep. 25:7-9.)  Generally, teachers who receive the advisory vote are recommended by the Principal and Superintendent, and given the position by the Board of Education.  (Id. 25:20.)

Plaintiff won the departmental vote, but Redman did not recommend her for the position.  (Pl.'s Stmt. ¶¶ 36, 37; Pl. Dec. ¶ 14.)  Instead, Redman recommended a male teacher on the grounds that he had more experience in curriculum development and got along better with the faculty.  (Pl. Dep. 76-79.)

#### c.     E-mail to Plaintiff about Lesson Plans

On September 13, 2004, while Plaintiff and a male teacher were in her classroom, Redman told them both that they needed to hand in their lesson plans.  (Id. 111-12.)

Plaintiff's plans were in fact late. (Id. 113:1-2.) On September 14, Redman sent Plaintiff an e-mail requesting that her lesson plans be submitted by the end of the day. (Id. 113-114; Defs.' Ex. 21.) Three male teachers received identical e-mails, on the same date, reminding them to hand in their lesson plans as well. (Defs.' Ex. 23, 24, 25.)

### d. Counseling for Writing an E-mail about a Student

On September 20, 2004, Plaintiff sent an e-mail from a classroom computer to a guidance counselor, which referred to a student by name and characterized him as "intellectually challenged-severely." (Pl. Dep. 84; Bair Dec., Ex. 19.) The student saw the e-mail on Plaintiff's computer and reported it to his mother, who made a complaint. (Pl. Dep. 87.)

Assistant Principal Walsh met with Plaintiff on September 22 to discuss the incident. (Id. 96:1-9.) He handed Plaintiff a "counseling memorandum" he had prepared, which stated she used poor judgment and showed a lapse in professionalism by composing such an e-mail, especially when a student was present. (Defs.' Ex. 20.) Plaintiff then presented her justification, after which it was determined the memorandum would be withdrawn and would not be placed in her personnel file. (Pl. Dep. 91, 98.)

Plaintiff told her Union representative that she was written up because Redman had feelings for her and was looking for excuses to discipline her. (Id. 144-45.) Union President Rosemary Murphy advised Plaintiff to bring her complaint to Superintendent Connolly (hereinafter, "Connolly"). (Id. 145:9-14.)

Plaintiff met with Connolly on September 23, 2004 and told him of "all the gestures and comments that Mr. Redman had made to [her] over the years," the bet, the fact she was not recommended for department chair, and the write-up. (Id. 146-47.) Connolly

agreed to look into her claims. (Id. 147.) He conducted a two-day investigation in which he met with several individuals, including Redman. (Defs.' Stmt. ¶¶ 56-57.) None of the individuals supported Plaintiff's allegations and Connelly advised Plaintiff that he found no evidence to support her claims. (Id. ¶¶ 58-66.)

Connolly told Plaintiff that if she wanted to submit her complaints in writing, he would hire an outside investigator. (Id. ¶ 67.) On the advise of her Union leaders, Plaintiff decided not to submit her complaint in writing. (Pl.'s Stmt. ¶ 64.)

Plaintiff filed her first complaint with the New York State Department of Human Rights (hereinafter, "NYSDHR") on November 23, 2004, on the grounds that Redman harassed her on a continuous basis by winking at her, paying her extra attention, and taking part in a bet. (Defs.' Ex. 2.) She further claimed, that Redman denied her the Chairmanship of the Business Department in December 2000, and directed an Assistant Principal to discipline her without cause in September 2004. (Id.)

Plaintiff took leave from work for two weeks, on advise of her psychiatrist, starting on November 3, 2005, and again from December 28, 2005 until January 3, 2006. (Defs.' Ex. 33, 34; Pl.'s Stmt. ¶ 65.)

### e.    Counseling Memorandum for Failure to Discipline

On January 6, 2006, Plaintiff heard a disruption in the hallway outside of her classroom. (Defs.' Stmt. ¶ 82.) Plaintiff went to help, but Redman and Walsh were already addressing the situation. (Id.) Plaintiff told her class "Administration is handling it," to which several of her students replied, "F*** Mr. Redman," and one stated, "I'll take care of Redman for you." (Id; Pl. Dep. 165:10-14; Defs.' Ex. 31.)

Plaintiff met with new Superintendent Jeffrey Rabey (hereinafter, "Rabey") on

January 9, 2006 to discuss the students' comments about Redman and why the students were not disciplined. (Rabey Dec. ¶¶ 51, 53.) Plaintiff informed Rabey that she did not formally discipline the students because on November 2, 2005, Redman had investigated one of them about a petition that was alleged to have been circulated in her class.[5] (Pl. Dep. 163:19.) Plaintiff claimed Redman's investigation was linked to the NYSDHR charge she had filed a year prior. (Rabey Dec. ¶ 53.) Rabey investigated her claim and met with Plaintiff on January 10, 2006. (Defs.' Ex. 31.) He advised Plaintiff that he could find no connection between her NYSDHR charge and Redman's questioning of the student. (Rabey Dec. ¶ 54-56.) He directed Plaintiff to give disciplinary referrals to the students who had violated the Code of Conduct. (Id. ¶ 56.)

Rabey documented the events January 9 and 10 in a memorandum he sent to Plaintiff, which also was copied in her personnel file. (Defs.' Ex. 31.) Plaintiff considers this memorandum a disciplinary note. (Pl.'s Stmt. ¶ 69.)

### 3. Retaliation

Lastly, Plaintiff asserts that she was retaliated against by Redman for making her discrimination complaints. In December 2004, a student submitted a petition to the District Board of Education to establish an extra-curricular dance club. (Pl. Dep. 153-55; Defs.' Ex. 26.) Plaintiff and Rosanne Miller (hereinafter, "Miller") were named as teachers interested in advising the club. (Id.) Redman asked Miller to be the club's advisor. (Pl. Dep. 155.) On January 21, 2005, Plaintiff e-mailed a letter of intent to Redman, stating she wished to be co-advisor of the club. (Id. 157.) However, Redman replied that the District had already

---

[5] The petition, which was started by the students, had to do with Redman changing the students' lavatory privileges. (Redman Dep. 79:6-7.)

selected Miller. (Id.)

On February 25, 2005, Plaintiff filed her second complaint with the NYSDHR, alleging Defendants retaliated against her for filling her discrimination complaint when they declined to appoint her as faculty advisor to the dance club. (Defs.' Ex. 29.)

Plaintiff resigned from her position by letter dated July 10, 2006. (Pl.'s Stmt. ¶ 77.) The District accepted Plaintiff's resignation by letter dated August 16, 2006. (Defs. Ex. 14.)

**B.     Procedural History**

On March 23, 2006, the NYSDHR dismissed both of Plaintiff's charges after investigating her claims. (Defs.' Ex. 22, 35.) The NYSDHR found no probable cause to believe the District engaged in or was engaging in sexual harassment. (Defs.' Ex. 22.) It concluded Redman never made any sexual or vulgar comments towards Plaintiff, and Plaintiff acknowledged as much. (Id.) It also determined Plaintiff was not treated differently than other employees in similar circumstances. (Id.) Furthermore, the NYSDHR found Plaintiff was not retaliated against when she did not receive the advisor position; rather, the position was filled by a more qualified candidate. (Defs.' Ex. 35.) The EEOC adopted the findings of the NYSDHR, and dismissed the charges on May 2, 2006 and May 9, 2006, respectively. (Defs.' Ex. 36.)

Plaintiff filed her Complaint with the Clerk of this Court on July 24, 2006. (Docket No. 1.) Defendants filed an Answer thereto on August 17, 2006. (Docket No. 2.) Defendants filed the instant Motion for Summary Judgment on December 31, 2007. (Docket No. 24.)

# III. DISCUSSION AND ANALYSIS

## A.     Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides that summary judgment is warranted where "the pleadings, the discovery and disclosure material on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2).  A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).  A fact is "material" if it "might affect the outcome of the suit under governing law." Id.

In deciding a motion for summary judgment, the evidence and the inferences drawn from the evidence must be "viewed in the light most favorable to the party opposing the motion."  Addickes v. S.H. Kress and Co., 398 U.S. 144, 158-59, 90 S.Ct.1598, 1609, 26 L.Ed.2d 142 (1970).  Summary judgment is proper "only when reasonable minds could not differ as to the import of evidence."  Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991). The function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Anderson, 477 U.S. at 249.

In the context of employment discrimination cases, the United States Court of Appeals for the Second Circuit has explicitly cautioned district courts to use extra care when deciding whether to grant summary judgment because "the ultimate issue to be resolved in such cases is the employer's intent, an issue not particularly suited to summary adjudication."  Eastmer v. Williamsville Cent. Sch. Dist., 977 F. Supp. 207, 212 (W.D.N.Y.

1997) (quoting <u>Gallo v. Prudential Residential Servs.</u>, 22 F.3d 1219, 1224 (2d Cir. 1994)).

Nonetheless, "[t]he summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion."  <u>Meiri v. Dacon</u>, 759 F.2d 989, 998 (2d Cir. 1985).  Indeed, the Second Circuit has noted that "the salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination cases than to commercial or other areas of litigation."  <u>Id.</u>

**B.      Plaintiff's Hostile Work Environment Claims**

**1.      Timeliness**

To sustain a claim under Title VII, a plaintiff must file a timely charge with the EEOC or the equivalent state agency.  <u>Van Zant v. KLM Royal Dutch Airlines</u>, 80 F.3d 708, 712 (2d Cir. 1996); <u>Cornwell v. Robinson</u>, 23 F.3d 694, 706 (2d Cir. 1994).  In a state such as New York, where state and local agencies have the authority to grant relief from unlawful employment practices, a hostile work environment claim must be filed with the state or local agency within 300 days after the alleged unlawful employment practice occurred.  <u>42 U.S.C. § 2000e-5(e)(1).</u>  This requirement acts as a statute of limitations.  <u>Kent v. Gen. Motors Reg'l Personnel Ctr.- E. Region</u>, 179 F.Supp.2d 102, 109 (W.D.N.Y. 2001).

"Unlawful employment practice" for hostile work environment claims consists of repeated conduct extending over a period of time.  <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 115, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002).  Therefore, as long as an act contributing to the claim occurs within the filing period, acts that fall outside of the statutory time period may be examined in their totality for the purposes of determining

liability for a hostile environment claim.  Id. at 117.

**2. Framework**

"One form of gender discrimination prohibited by Title VII is sexual harassment that results in a 'hostile or abusive work environment.'" Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 289 (2nd Cir. 1998) (quoting, Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 66, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).  "Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult." Meritor Sav. Bank, 447 U.S. at 65.  Only conduct prompted by a plaintiff's protected status or directed at a plaintiff because of his protected status contributes to a hostile work environment claim.  See Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002); Bush v. Fordham University, 452 F.Supp.2d 394, 413 (S.D.N.Y. 2006).

To survive a motion for summary judgment, a plaintiff claiming that she was the victim of a hostile work environment must produce evidence from which a reasonable trier of fact could conclude: "(1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [her] work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer."  Mack v. Otis Elevator Co., 326 F.3d 116, 122 (2d Cir. 2003) (quoting Richardson v. New York State Dept. Of Correctional Service, 180 F.3d 426, 436 (2nd Cir. 1999).  "The sufficiency of a hostile work environment claim is subject to both subjective and objective measurement: the plaintiff must demonstrate that she personally considered the environment hostile, and that the environment rose to some objective level of hostility."  Leibovitz v. New York City Transit Auth., 252 F.3d 179, 188 (2d

Cir. 2001). Looking at the present case, Plaintiff cannot demonstrate that her work environment was, from an objective standpoint, permeated with discriminatory intimidation severe enough to alter the conditions of employment.

Plaintiff's hostile work environment claim, as detailed above, is based upon the alleged "bet," four remarks about her appearance over a seven year period, an unspecified "derogatory remark," throwing a piece of paper at her, telling a gender-neutral falsehood about her, and brief contact with the side of her body on one occasion.

To meet the first requirement, a plaintiff must demonstrate "either that a single incident was extraordinarily severe, or that a series of incidents was sufficiently continuous and concerted to have altered the conditions of her working environment." Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000) (internal punctuation omitted). The appropriate test is whether the "harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse. . . ." Torres v. Pisano, 116 F.3d 625, 632 (2d Cir. 1997). Isolated and occasional instances of harassment do not ordinarily rise to this level. See Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 270-271, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001) (per curiam). And, it is well settled that "Title VII does not establish a 'general civility code' for the American workplace. Simple teasing, offhand comments, or isolated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment." Petrosino v. Bell Atlantic, 385 F.3d 210, 223 (2nd Cir. 2004). None of Plaintiff's alleged incidents, taken alone, are so severe as to create a hostile work environment.

"Absent extraordinary severity, a plaintiff must show that a 'series of incidents were sufficiently continuous and concerted to have altered the conditions of her working

environment." George v. Liverpool, 2000 WL 1499342 at *6 (N.D.N.Y. Sept. 29, 2000) (citing Cruz, 202 F.3d at 570). Courts examine various factors to ascertain whether a work environment is sufficiently hostile or abusive to support a Title VII claim. These factors include: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance." Leibovitz, 252 F.3d at 188 (citing Harris, 510 U.S. at 23); Terry v. Ashcroft, 336 F.3d 128, 147-48 (2d Cir. 2003).

Defendants do not deny Plaintiff's allegations, but argue that even if they are true, they do not describe an environment of sufficient severity to alter the condition of Plaintiff's employment. (Defs.' Memo. p. 12.)

Upon reviewing the totality of the circumstances, this Court finds that the incidents and comments Plaintiff attests to are not sufficiently pervasive, severe, and frequent to support a finding that the conditions of her workplace were altered for the worse. See Torres, 116 F.3d at 632; Leibovitz, 252 F.3d at 188. The alleged discriminatory conduct was not frequent enough to be deemed "continuous" or "regular" under Title VII. Plaintiff does not allege more than four or five comments over a seven year period that arguably made her uncomfortable. This is distinguishable from "a steady stream of unwelcome, escalating harassment." Maher v. Alliance Mortg. Banking Corp., 650 F.Supp.2d 249, 264 (E.D.N.Y. 2009). Nor was the alleged conduct particularly severe. Plaintiff alleges that Redman tried to get her attention and speak to her when he saw her in the hallway; however, his conduct did not go farther than gesturing for her to come to him, and then commenting that she looked good and/or fit. These comments were unaccompanied by

physical advances or threatening behavior.[6]  See, e.g., Cruz 202 F.3d at 571 (physically cornering victim "brings this case over the line separating merely offensive or boorish conduct from actionable sexual harassment.").  Plaintiff merely alleges "relatively innocuous incidences of overbearing or provocative behavior." Lamar v. Nysex Serv. Co., 891 F.Supp 184, 185 (S.D.N.Y. 1995) (finding that touching the plaintiff's hand, comments that she looked "hot," and staring at her were too mild to constitute sexual harassment). Furthermore, while Plaintiff submits she felt humiliated and offers evidence that her psychological well-being was negatively affected, she has not offered sufficient evidence that others would feel Redman's conduct was physically threatening or humiliating, such that it created a hostile working environment.[7]

Finally, Plaintiff has not put forth evidence that the alleged harassment interfered with her work performance.  The terms and conditions of Plaintiff's job remained the same throughout her employment, and she was never disciplined, demoted, or terminated. Plaintiff disputes Defendants' characterization of her as an "adequate teacher" and purports that she was an "excellent teacher" throughout.  Such a statement confirms Redman's behavior did not detrimentally interfere with her performance.  (Pl.'s Stmt. ¶ 35.) Also, despite her assertions that she received poor performance evaluations, Plaintiff

---

[6]Plaintiff alleges Redman's side touched her side briefly in the library in 2006.  The Court does not consider this "physically threatening," as Plaintiff does not suggest conduct that was sexual in nature or severe.

[7]Plaintiff submitted a statement of Mary Fran Wishman supporting Plaintiff's claim of harassment by Redman.  However, this is not sufficient to establish an objective hostile work environment because she does not show evidence that other female employees were subjected to Redman's alleged harassment.  Contra Gorzynski v. Jetblue Airways Corp., 596 F.3d 93 (2nd Cir. 2010) (incidents of sexual harassment directed at employees other than the plaintiff can be used as proof of a hostile work environment claim because it goes to the "general work atmosphere").

received overall positive reviews from Redman.[8]

Based on the foregoing, Defendants are entitled to summary judgment on Plaintiff's hostile work environment claim.

## C.     Plaintiff's Discrimination Claim

### 1.     Timeliness

Similar to a hostile work environment claim, an administrative charge for a claim of discrimination under Title VII must also be filed within 300 days of the alleged unlawful conduct.  Forsyth v. Fed'n Emp't and Guidance Serv., 409 F.3d 565, 572 (2d Cir. 2005) (citing 42 U.S.C. § 2000e-5(e)(1)); see Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393, 102 S. Ct. 1127, 71 L. Ed. 2d 234 (1982) ("filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling").

However, the time for filing a charge of employment discrimination begins when a "discrete act" occurs.  Ledbetter v. Goodyear Tire & Rubber Co., Inc., 550 U.S. 618, 127 S.Ct. 2162, 2165, 167 L.Ed.2d 982 (2007).  The Supreme Court held that discrete acts of discrimination are deemed to have occurred on the date they happened.  Morgan, 536 U.S. at 110.  Discrete acts generally are easy to identify and include such things as termination, failure to promote, denial of transfer, or refusal to hire.  Id. at 114.  Therefore, a party must file an EEOC charge within 300 days after the complained of act, or lose the ability to

---

[8]The February 2000 evaluation shows mostly "above average" and "superior" ratings, superior being the highest.  (Defs.' Ex. 16.)  The April 2002 evaluation reflects mostly "above average" and "average" ratings.  (Defs.' Ex. 17.)  The June 2002 evaluation shows the highest rating for all but one criteria.  (Defs.' Ex. 18.)

recover for it.  Id. at 108.  Discriminatory acts which are time barred may support a timely claim only as "background evidence."  Id. at 113.

Defendants argue that Plaintiff's allegations occurring more than 300 days prior to November 23, 2004 are time-barred, including Redman's professional evaluations of Plaintiff in 2000 and 2002, and his failure to recommend Plaintiff to the position of Chairman of the Business Department in 2000.  (Defs.' Memo. p.5, fn. 4.)  Plaintiff did not respond to this argument, and therefore appears to concede that the allegations are untimely.  See Alston v. City of New York, 03-CV-0086, 2006 U.S. Dist. LEXIS 67882, at *3-4 (E.D.N.Y. Sept. 21, 2006) (where plaintiff failed to file timely administrative charge prior to commencing suit and did not address that failure in opposition to motion, there was no basis to bypass the statutory prerequisite).  The Supreme Court instructs that the timely filing requirements of Title VII should be strictly enforced.  See Morgan, 536 U.S. at 108 (quoting Mohasco Corp. v. Silver, 447 U.S. 807, 826 (1980)) (holding "'strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law'").  Therefore, Plaintiff's charge is timely only to the extent she points to discrete acts of discrimination occurring on and after January 28, 2004.

### 2.    Framework

Under Title VII, it is unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin."  42 U.S.C. § 2000e-2(a)(1); Desert Palace, Inc. v. Costa, 539 U.S. 90, 123 S.Ct. 2148, 2150, 156 L.Ed.2d 84 (2003). It is now well settled that where a plaintiff does not come forward with direct evidence of

discrimination, the Court shall apply the burden shifting analysis of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-804, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973) and <u>Texas Dep't of Comt'y Affairs v. Burdine</u>, 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981).

The burden-shifting test first requires that the plaintiff establish a *prima facie* case of discrimination.  To state a *prima facie* case, a plaintiff must show that (1) she is a member of a protected class, (2) she is qualified for her position, (3) she suffered an adverse employment action, and (4) the circumstances of the adverse action give rise to an inference of discrimination.  <u>Weinstock</u>, 224 F.3d at 42 (citing <u>McDonnell Douglas</u>, 411 U.S. at 802).  "The burden of establishing a *prima facie* case of disparate treatment is not onerous."  <u>Burdine</u>, 450 U.S. at 253; <u>see</u> <u>also</u> <u>Carlton v. Mystic Transp., Inc.</u>, 202 F.3d 129, 134 (2d Cir. 2000) (characterizing the burden as "minimal").

If the plaintiff meets this initial burden and establishes a *prima facie* case, a rebuttable presumption of discrimination arises, and the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment action.  <u>Burdine</u>, 450 U.S. at 254.  If the defendant succeeds in making this showing, "the presumption of discrimination arising with the establishment of the *prima facie* case drops from the picture."  <u>Weinstock v. Columbia Univ.</u>, 224 F.3d 33, 42 (2d Cir. 2000) (citing <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 510-11, 113 S. Ct. 2742, 125 L. Ed.2d 407 (1993)).

Assuming that the defendant meets its burden at the second stage, the burden returns to the plaintiff to prove that the defendant's discrimination was intentional.  In this

regard, the plaintiff must produce "evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination." <u>Weinstock</u>, 224 F.3d at 42. "In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination." <u>Id.</u> However, "[i]t is not enough . . . to disbelieve the employer; the factfinder must [also] believe the plaintiff's explanation of intentional discrimination." <u>Id.</u> (quoting <u>St. Mary's</u>, 509 U.S. at 519).

### a. Failure to Establish a *Prima Facie* Case of Discrimination

Defendants contend that Plaintiff cannot establish a *prima facie* case of discrimination because she did not suffer an adverse employment action, and even assuming she did, that the circumstances of the adverse action do not give rise to an inference of discrimination.

Plaintiff alleges she suffered several adverse employment actions. The ones which are not time-barred are discussed below.

### (1) E-mail to Plaintiff about Lesson Plans

First, Plaintiff alleges she was singled out for not submitting her lesson plans in a timely manner when she received an e-mail from Redman regarding same. (Pl. Dec. ¶ 29; Pl. Dep. 111-12.) However, Plaintiff concedes her lesson plans were late. (Pl. Dep. 113:1-2.) And, as Defendants point out, identical e-mails were sent to three male teachers who also had not timely submitted their lesson plans. (Defs.' Memo. p. 6; Defs.' Ex. 23, 24, 25.)

The Second Circuit defines an adverse employment action as a "materially adverse change" in the terms and conditions of an individual's employment. <u>Sanders v. New York City Human Res. Admin.</u>, 361 F.3d 749, 755 (2d Cir. 2004); <u>Galabya v. New York City Bd.</u>

of Educ., 202 F.3d 636, 640 (2d Cir. 2000). Plaintiff does not claim the e-mail was disciplinary in nature, nor has she made even a *de minimus* showing that it caused a materially adverse change in the terms and conditions of her employment.

Furthermore, there is nothing about the e-mail that gives rise to an inference of gender-based discrimination. A plaintiff may raise such an inference by showing that the employer treated her less favorably than a similarly situated employee outside of her protected group. Graham v. Long Island R.R., 230 F.3d 34, 39 (2nd Cir. 2000). Considering there were three male teachers who received identical e-mails from Redman, Plaintiff was not subjected to disparate treatment.

### (2)    Disciplinary Actions

Plaintiff also alleges she received disciplinary notes on two occasions, first from Assistant Principal Walsh for writing an unprofessional e-mail about a student in September 2004, and second from Superintendent Rabey for failing to discipline a student who violated the Code of Conduct in January 2006. (Pl.'s Stmt. ¶ 48, 69.) Defendants argue Walsh's 2004 counseling memorandum was not an adverse employment action because it was never copied to Plaintiff's personnel file. (Defs.' Memo. p. 5.) However, they do not dispute the reprimand from Rabey was placed in her personnel file.

Courts within the Second Circuit have "found that reprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions." Bennett v. Watson Wyatt & Co., 136 F. Supp.2d 236, 248 (S.D. N.Y. 2001) (collecting cases). Plaintiff fails to allege that either the counseling memorandum or the reprimand resulted in any tangible adverse employment action. Courts have held that disciplinary write-ups,

whether placed in a personnel file or not, which are not accompanied by any adverse change in the terms and conditions of her employment do not amount to an adverse employment action.  Ludwig v. Rochester Psychiatric Cntr., 550 F.Supp.2d 394, 398 (W.D.N.Y. 2008); see, Shabat v. Blue Cross Blue Shield of Rochester Area, 925 F.Supp. 977, 987 (W.D.N.Y. 1996) (The fact that disciplinary notes were placed in employee's personnel file were relatively trivial employment actions that could not reasonably be considered adverse employment action necessary to support Title VII claim).  "Such criticism, without any negative results such as a decrease in pay or being placed on probation, cannot support plaintiff's discrimination claim." Bennett, 136 F. Supp.2d at 248.

. . .

In light of the foregoing, no reasonable juror could find, on the basis of this record, that Plaintiff has demonstrated a *prima facie* case of discrimination.  Thus, Defendants are entitled to summary judgment on Plaintiff's claims for discrimination in violation of Title VII, and the Court need not consider Defendants' further contentions that they had legitimate non-discriminatory reasons for their actions and that Plaintiff cannot show those reasons are pretextual.

C.      **Plaintiff's Retaliation Claims**

1.      **Timeliness**

The filing of retaliation claims are subject to the same statutory time limitations as discrimination claims.  Again, a party must file an administrative charge within 300 days after a "discrete act" occurs.  Morgan, 536 U.S. at 113.  Each "retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'"

<u>Morgan</u>, 536 U.S. at 114.

### 2. Framework

It is unlawful under Title VII for employers to retaliate against employees who participate in protected activities, such as challenging discriminatory practices or actions. 42 U.S.C. § 2000e-3(a); <u>Sanders v. N.Y. City Human Res. Admin.</u>, 361 F.3d 749, 755 (2d Cir. 2004).  When evaluating a Title VII retaliation claim, courts employ the <u>McDonnell-Douglas</u> burden-shifting analysis.  The allocation of burdens of proof in retaliation claims parallels that of discrimination claims.  <u>Reed v. A.W. Lawrence & Co.</u>, 95 F.3d 1170, 1178 (2d Cir. 1996) (citations omitted).

However, the elements of a *prima facie* case for retaliation differ somewhat.  To prevail on a retaliation claim, the plaintiff must show that (1) she participated in a protected activity, (2) her participation was known to the defendant, (3) she suffered an adverse employment action, and (4) a causal connection exists between the protected activity and the adverse employment action.  <u>Richardson</u>, 180 F.3d at 443; <u>Jones v. Smithkline Beecham Corp.</u>, 309 F.Supp.2d 33, 356 (N.D.N.Y. 2004).  Defendants argue Plaintiff has not and cannot sustain her burden of proving the third and fourth elements.

Plaintiff argues that she was retaliated against for filing her first complaint with the NYSDHR by not receiving the position of advisor of the dance club.  Defendants contend this was not an adverse employment action because the position did not provide for any additional compensation and her teaching position did not change.  (Def.'s Memo. p. 20, n.18.)  Plaintiff conclusorily states that the position would result in a paid advisorship.  (Pl. Dec. ¶ 47.)

The scope of Title VII's retaliation provision is broader than that of Title VII's

substantive discrimination provision. It is not limited to an employer's actions that affect terms, conditions, status of employment, or those that occur at the workplace. <u>Burlington Northern and Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 62, 126 S.Ct. 2405, 2411-12 (U.S. 2006). Rather, the question is whether a reasonable employee would be dissuaded from engaging in protected conduct. <u>Id.</u> at 2412-13. The Court finds that failing to receive a voluntary advisorship position for one extra-curricular club would not prevent a reasonable employee from challenging discriminatory practices or actions.

Plaintiff's claim that the position would result in a paid advisorhip is too conclusory to survive summary judgment. <u>See</u> <u>Hicks v. Baines</u>, 593 F.3d 159, 168 (2nd Cir. 2010) ("[A] party cannot create a triable issue of fact merely by stating in an affidavit the very proposition they are trying to prove."). Rosemary Murphy, Union President at the time, testified that when the club was approved, the advisorship position was voluntary and there was no monetary attachment or stipend. (Murphy Dep. 30-31.) She further stated the Union intended to seek a stipend for the position when the contract came up for negotiation. (Id.) The amount of the stipend, should it be given, was undetermined and would depend upon the details of the club and the other organizations needing a stipend at time. (Id.) Plaintiff does not make clear whether the Union sought a stipend, whether it was granted, and if so, what the amount was.

Given the record before us, it appears the "dance club advisor" title carried little or no value and its deprivation therefore may be classified as *de minimus*. <u>Zelnik v. Fashion Inst. of Tech.</u>, 464 F.3d 217, 227 (2nd Cir. 2006) (finding the benefit of affording "Professor Emeritus" status to plaintiff is merely honorific and does not entitle any benefit beyond what is afforded to other retired faculty members). Thus, Plaintiff has not suffered an adverse

employment action.

Defendants also contend Plaintiff cannot establish a causal connection between her NYSDHR Complaint and the decision on the advisory position. A causal connection may be established either:

> "(1) indirectly by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engage in similar conduct, or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant."

Gordon v. New York City Bd. of Educ., 232 F.3d 111, 117 (2nd Cir. 2000). Plaintiff does not offer direct evidence of animus, but purports the adverse action took place two months after her Complaint was filed, thus creating a causal connection. Plaintiff filed her first complaint with the NYSDHR on November 23, 2004. (Pl.'s Stmt. ¶ 79.) She helped write the petition for the dance club in December 2004. (Id. ¶ 40.) By January 2005, Miller had been appointed as advisor, and Plaintiff was turned down as co-advisor. (Pl. Dep. 157.)

There is no bright line rule as to "when the temporal link becomes too attenuated to establish a causal relationship." See Gorman-Bakos v. Cornell Coop. Extension, 252 F.3d 545, 554 (2nd Cir. 2001). Courts have found that a gap of two months may permit a jury to find the acts to be causally related. See Ashok v. Barnhart, 289 F.Supp.2d 305 (E.D.N.Y. 2003); see also, Quinn v. Green Tree Credit Corp, 159 F.3d 759 (2nd Cir. 1998). However, without any other direct or circumstantial evidence, temporal proximity is insufficient to satisfy a Plaintiff's burden of showing evidence of pretext. Simpson v. New York State Dep't of Civil Servs., 166 Fed.Appx. 499, 500, 502 (2nd Cir. 2006); see Stoddard v. Eastman Kodak Co., 309 Fed.Appx. 475 (2nd Cir. 2009) ("in the instant case, where the protected activity took place two months prior to the alleged adverse action, and

where there is nothing other than that temporal proximity invoked to establish a retaliatory intent, the causal relationship is not established). Therefore, Plaintiff has not presented sufficient evidence to raise an inference of discriminatory animus.

. . .

Because Plaintiff has not shown an adverse employment action or causal relationship, and thus has failed to establish a *prima facie* case of retaliation, summary judgment in granted as to Plaintiff's retaliation claim.


**D.     State Law Claims**

Plaintiff's claims under the NYHRL and Title VII are identical. Generally, "New York courts require the same standard of proof for claims brought under the [NY]HRL as those brought under Title VII." <u>Tomka v. Seiler Corp.</u>, 66 F.3d 1295, 1304 n.4 (2d Cir. 1995). However, one difference between Title VII and the NYHRL is that the NYHRL allows the imposition of employer liability on individual employees under the aider and abetter provision of Section 296(6). <u>See</u> <u>Tomka</u>, 66 F.3d at 1317. Nevertheless, a plaintiff must first establish an employer's liability. "[T]hus where a court determines that there is no genuine issue of material fact with respect to the defendant's liability by its employee, the plaintiff cannot prevail on her state law claim against that employee." <u>Schiano v. Quality Payroll Systems, Inc.</u>, 2005 WL 1638167 (E.D.N.Y. 2005).

. . .

Based on the analysis above granting Defendants' motion for summary judgment under Title VII, Defendants' motion is also granted under the NYHRL.

**IV.  ORDERS**

IT HEREBY IS ORDERED, that Defendants' Motion for Summary Judgment (Docket No.24) is GRANTED consistent with this Decision and Order.

FURTHER, that the Clerk of the Court is directed to close this case.


SO ORDERED.


Dated:  February 10, 2011
        Buffalo, New York


                                        /s/William M. Skretny
                                        WILLIAM M. SKRETNY
                                           Chief Judge
                                    United States District Court